IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| **RICHARD BERNARD MOORE,** | ) | No. 3:20-cv-4084-MGL |
| | ) | _____ |
| Plaintiff, | ) | |
| | ) | **Death Penalty Case** |
| v. | ) | *Execution date December 4, 2020* |
| | ) | |
| **BRYAN P. STIRLING**, in his official capacity as the Director of the South Carolina Department of Corrections, | ) | |
| | ) | |
| | ) | COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT |
| **SOUTH CAROLINA DEPARTMENT OF CORRECTIONS,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ALAN WILSON**, in his official capacity as the South Carolina Attorney General, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

J. CHRISTOPHER MILLS
J. CHRISTOPHER MILLS, LLC
FED. ID # 4802
2118 Lincoln Street
Columbia, SC 29202
(803) 748-9533

EMILY PAAVOLA
FED. ID # 11488
900 Elmwood Ave., Suite 200
Columbia, SC 29201
(803) 765-1044

LINDSEY S. VANN
FED. ID # 11872
HANNAH FREEDMAN
FED. ID # 13140
JUSTICE 360
900 Elmwood Ave, Suite 200
Columbia, SC 29201
(803) 765-1044

*Counsel for Plaintiff*

## COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF AND FOR A DECLARATORY JUDGMENT

Plaintiff Richard Moore, by his undersigned counsel, brings this action against Defendants and alleges as follows:

### NATURE OF THE ACTION

1.    This action is brought pursuant to 42 U.S.C. sections 1983 and 1988 and 28 U.S.C. sections 2201 and 2202, for violations and threatened violations of Richard Moore's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution; right to due process under the Fourteenth Amendment to the United States Constitution; and statutory and due process rights to the assistance of counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, and its corresponding policies.

### INTRODUCTION

2.    Plaintiff, Richard Bernard Moore, is a prisoner of the State of South Carolina, under a sentence of death. He is presently scheduled to be executed on December 4, 2020.

3.    Moore is housed at Edisto Unit, Broad River Correctional Institution (BRCI), under the control and supervision of Defendant South Carolina Department of Corrections (SCDC).

4.    Prior to the exhaustion of his federal post-conviction proceedings, Moore sought information from SCDC regarding its execution protocols. To date, SCDC has not provided Moore the requested information, relying on broad claims of security and an opinion from Defendant Wilson that cites a state statute. *See* Office of the Att'y Gen., State of S.C., Opinion Letter, 2015 WL 4699337 (July 27, 2015) (asserting that the phrase "member of an execution team" in Section 24-3-580 of the South Carolina Code must be interpreted broadly to include "individuals or companies providing or participating in the preparation of chemical compounds" to be used in an execution).

1

5. On November 6, 2020, at the Attorney General's request, the Clerk of the South Carolina Court issued a warrant for Moore's execution on December 4, 2020. On the same day, SCDC officials served notice of that warrant on Moore.

6. Section 24-3-530(A) of the South Carolina Code grants condemned inmates the right to select between two legislatively authorized modes of execution: lethal injection and electrocution. For a person, like Moore, who was sentenced to death after the statute was amended to add lethal injection as an execution method in 1995, a failure to select one of the two options is construed as a waiver and the statute mandates that the mode of execution shall be by lethal injection.

7. On information and belief, no person in the United States has been executed by lethal injection with such little access to information about how they will be put to death. Megan McCracken Aff. ¶¶ 12-13 (Nov. 14, 2020), attached to this complaint as Exhibit 1.

8. On information and belief, no person in the United States has been executed by electrocution since at least the 1970s with such limited information on how they will be executed.

9. On information and belief, Defendants are attempting to obtain execution drugs through unlawful means.

10. Executions that are carried out with little or no oversight, or that are carried out "using unlawfully procured, substandard, counterfeit or adulterated medicines," are more likely to result in torturous executions. Donald F. Downing Aff. ¶ 60 (Nov. 22, 2020), attached to this complaint as Exhibit 2.

11. Moore could not make a selection between lethal injection and electrocution by the statutory deadline of November 20, 2020 because SCDC deprived him of the information necessary to make an informed decision. SCDC construed Moore's refusal to choose either

electrocution or lethal injection as choosing lethal injection. He did not. Defendants' refusal to disclose this information violates Moore's right to due process of law as guaranteed by the Fourteenth Amendment.

12.     Moore seeks a declaratory judgment that the Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits Defendants from carrying out an execution without first providing Moore adequate information about how it intends to execute him, including a copy of the execution protocols, with sufficient time before the execution for Moore and his counsel to review it and consult with experts about it. Moore has a state-created liberty and life interest in making an informed election between electrocution and lethal injection, and Defendants' withholding has wrongfully deprived him of that interest.

13.     Moore's counsel represent him pursuant to an appointment under the Criminal Justice Act, 18 U.S.C. § 3599. *See* Order, *Moore v. Stirling*, No. 4:14-4691-MGL, ECF No. 17 (Dec. 17, 2014); *see also* Text Order, *id.*, ECF No. 171 (June 23, 2020) (substituting counsel). The appointments encompass all "remaining stages of [Moore's] legal proceedings." *Id.* at § 3599(e). By denying Moore access to information necessary for his attorneys to effectively counsel him in making one of the most fundamental decisions of all—how he will die—Defendants have deprived Moore of his statutory right to the assistance of counsel, in violation of his right to due process.

14.     Without the information Defendants refuse to disclose, Moore is limited in his ability to raise a potentially viable execution method challenge under the Eighth Amendment. Defendants are interfering in Moore's constitutionally protected rights guaranteed by the Eighth Amendment. Attempting to execute Moore using a last-minute protocol (or no protocol at all) with drugs of unknown origin and quality poses a sure or very likely risk of needless suffering, in

violation of the Eighth Amendment. *See Baze v. Rees*, 553 U.S. 35, 50 (2008); Downing Aff. ¶¶ 44-60.

## JURISDICTION AND VENUE

15.    Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, in that this is a civil action arising under the Constitution and laws of the United States, and by 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1988, in that this is an action for declaratory judgment and equitable relief as authorized by law to redress deprivations of rights, privileges and immunities secured by the United States Constitution, effectuated by Defendants under color and authority of state law.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b) in that all Defendants reside in, and all the events giving rise to this action occurred in, the District of South Carolina.

17.    Under the Prisoner Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Moore has exhausted his available remedies as documented in Exhibits 4 through 7 and 9 through 13.

## PARTIES

18.    Plaintiff Richard Moore is a citizen of the United States of America, currently incarcerated under a sentence of death at Edisto Unit, BRCI. Moore is under the control and supervision of SCDC.

19.    Defendant SCDC is a division of the State of South Carolina, which is charged with overseeing the custody and care of individuals incarcerated in South Carolina.

20.    Defendant Bryan Stirling is the Director of SCDC. He is charged under Sections 24-3-510, 24-3-530, 24-3-540, and 24-3-550 of the South Carolina Code, with overseeing and

carrying out executions in South Carolina. He is a citizen and resident of the State of South Carolina. Stirling is sued herein in his official capacity.

21.    Defendant Alan Wilson is the Attorney General of South Carolina. Wilson and his employees are charged, by statute, to represent the State of South Carolina in "all causes, criminal and civil, in which the State is a party or interested." S.C. Code Ann. § 1-7-40. On information and belief, Wilson and his employees have participated in assisting SCDC and Stirling in obtaining drugs for a lethal injection and have reviewed the information Moore seeks. In 2015, in response to a request from SCDC, Wilson provided a public opinion on the meaning of one of the state statutes as issue here, Section 24-3-580, South Carolina Code. Office of the Att'y Gen., State of S.C., Opinion Letter, 2015 WL 4699337. On information and belief, Wilson's public opinion has formed the basis for SCDC's withholding. Additionally, Wilson and his office have worked to persuade the South Carolina Supreme Court to refuse to provide the requested information regarding how South Carolina intends to carry our Moore's execution. A true and accurate copy of Wilson's motion to the Supreme Court of South Carolina is attached to this complaint as Exhibit 3. Wilson is sued herein in his official capacity.

### FACTS COMMON TO ALL CLAIMS
#### Procedural History

22.    Moore was sentenced to death in Spartanburg County in 2001 in connection with the 1999 death of James Mahoney, a convenience store clerk. *State v. Moore*, 593 S.E.2d 608 (S.C. 2004). Moore exhausted his state post-conviction remedies, filed a petition for a writ of habeas corpus in this Court, and exhausted his federal remedies in early November. *See Moore v. Stirling*, 952 F.3d 174 (4th Cir. 2020), *cert. denied*, No. 20-5570, 2020 WL 6385899 (U.S. Nov. 2, 2020).

23.    On September 1, 2020 (more than two months before the earliest date on which Moore could have expected the final exhaustion of his federal claims) counsel for Moore sent a

letter to SCDC requesting (1) the SCDC lethal injection directive or protocol, including the "type(s) of lethal injection drug(s) to be used;" (2) the SCDC electrocution directive or protocol; (3) information related to the qualifications and training of individuals making up the execution team; and, (4) any modifications to the execution protocols related to the COVID-19 pandemic. A true and accurate copy of this letter, the Moore Letter, is attached to this complaint as Exhibit 4. On September 29, Salley W. Elliot, SCDC's Chief Legal and Compliance Officer, responded by letter denying Moore's request. A true and accurate copy of this letter, the SCDC Letter, is attached to this complaint as Exhibit 5.

24.    On October 13, 2020, Justice 360 (an organization comprised of capital defense attorneys, including Moore's counsel) filed a Freedom of Information Act (FOIA) Request with SCDC, seeking disclosure of the same materials requested in the Moore Letter. On October 21, 2020, SCDC denied the entirety of the FOIA request, asserting three exemptions: (1) security plans and devices, S.C. Code § 30-4-40(a)(2); (2) unreasonable invasion of personal privacy, § 30-4-40(a)(4); and, (3) exemption by statute § 24-3-580, which provides that "a person may not knowingly disclose the identity of a current or former member of an execution team" unless upon court order in pending litigation. True and accurate copies of Justice 360's FOIA request and the response from SCDC are attached to this complaint as Exhibits 6 and 7, respectively. On November 12, 2020, Justice 360 filed a FOIA appeal in the Richland County Court of Common Pleas. *Justice 360 v. S.C. Dep't. Corr.*, No. 2020-CP-40-05306. An initial hearing pursuant to FOIA is scheduled for November 24, 2020. *See* S.C. Code § 30-4-100(A).

25.    On October 19, 2020, Justice 360 filed suit in this Court against Stirling and Wilson, seeking disclosure of the information requested in the Moore Letter. *Justice 360 v. Stirling*, No.

3:20-03671-MGL (D.S.C.).[1] In the suit, Justice 360 alleges Defendants violated Justice 360's First Amendment right of professional speech by refusing to provide information necessary for its attorneys to adequately counsel their clients on their statutory right to elect between execution methods and to advise their clients on the viability of any Eighth Amendment challenges to the methods of execution as proposed by SCDC's protocols.

26.    On November 6, 2020, at Wilson's request, the Clerk of the Supreme Court of South Carolina issued a warrant for Moore's execution on December 4, 2020. A true and accurate copy of Wilson's request and the warrant are attached to this complaint as Exhibit 8. On the same day, SCDC officials served notice of the warrant on Moore and asked him to elect a method of execution pursuant to Section 24-3-530(A), South Carolina Code. That section of the state code provides:

> A person convicted of a capital crime and having imposed on him the sentence of death shall suffer the penalty by electrocution or, at the election of the person, lethal injection under the direction of the Director of the Department of Corrections. The election for death by electrocution or lethal injection must be made in writing fourteen days before the execution date or it is waived. If the person waives the right of election, then the penalty must be administered by lethal injection.

27.    On November 6, 2020, having no information about SCDC's plan for effectuating his death, either by electrocution or lethal injection, Moore informed the SCDC officials that he could not select a method of execution. The officials responded that they would return on November 20, 2020—the last day on which a selection was statutorily authorized—to ask for Moore's election of a mode of execution.

---

[1] Because this litigation and the above-referenced litigation involve a number of "common question[s] of law or fact," this Court could "consolidate the actions" as authorized by Federal Rule of Civil Procedure 42(a). Moore would not oppose consolidation.

28.     In another effort to make an informed decision, Moore submitted requests for the lethal injection and electrocution protocols, through the SCDC staff request system and using SCDC forms, to BRCI Warden Michael Stephen, Associate Warden Eric Ramos and Regional Director Willie Davis on November 10, 2020. True and accurate copies of Moore's requests are attached to this complaint as Exhibit 9. Moore's requests have, to date, gone unanswered.

*29.*     On November 6, 2020, Moore filed a motion for a stay of execution in the South Carolina Supreme Court based on the likelihood of SCDC staff, Moore's attorneys, and other participants in and witnesses to Moore's execution being exposed to COVID-19 during an execution. Defendant Wilson's office opposed this motion and the Supreme Court of South Carolina appears to have denied the motion on November 20. A true and accurate copy of the court's order is attached to this complaint as Exhibit 10.

30.     On November 16, Moore filed petitions in the Supreme Court of South Carolina seeking a writ of mandamus, a writ of common law certiorari, and declaratory judgment in the court's original jurisdiction. Moore also filed a second stay motion. The petitions sought expedited review in the court's original jurisdiction, which is warranted only when "the public interest is involved, or if special grounds of emergency or other good reason exist." Rule 245(a), SCACR. Specifically, Moore asked the court to "order[] Respondents to produce copies of the execution protocols and other requested information relevant to how they intend to carry out Moore's execution." App. at 2.[2]

---

[2] Cases docketed in the original jurisdiction of the Supreme Court of South Carolina are not publicly available. For the Court's convenience, all legal papers filed in connection with the case captioned *Moore v. Stirling*, No. 2020-001508 (S.C. Nov. 20, 2020) are attached to this complaint as an Appendix.

31.    On November 18, SCDC began making public statements to the media, some of which disclosed to the public information SCDC has consistently denied to Moore under the guise of security precautions. Various outlets reported that, according to SCDC, they do not have the drugs needed to carry out an execution and that they are attempting to use a three-drug protocol. *E.g.* Michelle Liu, *South Carolina Schedules Execution but Doesn't Have Drugs*, Associated Press, Nov. 18, 2020, https://apnews.com/article/coronavirus-pandemic-executions-south-carolina-spartanburg-fe4f4690d0d4ca8181e50f85b226a3ee.

32.    Also on November 18, two days before Moore's opportunity to select a method of execution would expire, counsel for the state-court Defendants/Respondents filed a return to the petitions and an answer to Moore's complaint. Despite refusing, for months, to give Moore any information he has requested, SCDC made the following representation in its return: "SCDC has decided that it will allow members of Petitioner's legal defense team access to the protocols for both electrocution and lethal injection before Petitioner makes his election on, or before, November 20, 2020." The proposed access was to "review the execution protocols that are in effect in a confidential setting." An affidavit from Colie Rushton, the Director of Security for SCDC, was attached to the return. A true and accurate copy of this affidavit is attached to this complaint as Exhibit 11.

33.    In response to this offer, Moore's counsel filed a Reply to SCDC's Return indicating that the offer to review the protocols was insufficient because the protocols could not possibly be final if, as SCDC was representing to the media, they did not possess lethal injection drugs required by its protocol. Nevertheless, because Moore needed to see the protocols to be even partially informed, counsel contacted opposing counsel to schedule a time to view the protocols.

34.    Although SCDC's Return did not include any parameters for "confidential review," opposing counsel informed Moore's attorneys on November 18 that they would be asked to comply with the following list of "logistics for review":

1. At SCDC headquarters
2. We can be flexible on the time
3. At SCDC headquarters
4. Protocols will be available in a conference room for your review
5. No copies will be given
6. No photos or other verbatim copying of the protocols would be allowed
7. Notes can be taken but any notes must be held confidential and only used to advise Mr. Moore as he chooses his election pursuant to SC Code 24-3-530.

Moore's counsel made arrangements with opposing counsel to meet at SCDC headquarters at 1:00 p.m. on November 19 to review the protocols, subject to the above noted restrictions.

35.    Less than thirty minutes before Moore's counsel had been instructed to arrive at SCDC headquarters, SCDC's general counsel sent Moore's counsel a "confidentiality agreement." The "agreement" was a copy of a contract that Moore's attorneys would be required to sign before viewing the protocols. A true and accurate copy of this document is attached to this complaint as Exhibit 12. The "agreement" included the following paragraph:

Receiving Parties agree that any breach of this Agreement by any Receiving Party will cause irreparable harm to SCDC, its employees, and any potential member of the execution team for the execution of Richard Bernard Moore, that cannot be adequately compensated with money damages. Accordingly, SCDC shall be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies, to include, but not be limited to, reasonable attorneys' fees. In the event SCDC is required to enforce the terms of this Agreement in order to remedy or prevent any breach of this Agreement, the Receiving Party shall, in addition to any other damages for which it is responsible hereunder, pay and reimburse to SCDC the reasonable attorneys' fees and costs of SCDC associated with such enforcement.

36.    Moore's counsel declined to sign this agreement and indicated to opposing counsel that they would no longer be attending the meeting scheduled for 1:00. True and accurate copies of the emails between the parties are attached to this complaint as Exhibit 13.

37.    Moore's attorneys then filed a supplement to his Reply explaining that they could not sign the proposed contract because doing so would have amounted to a concession that SCDC's vague and undisclosed security concerns are valid and necessary to prevent "irreparable harm," an assertion that contains disputed questions of fact and a matter of statutory interpretation involved in the litigation. App. at 045. Moreover, Moore explained that the agreement would have bound him to "a restrict category of use, dictated by Respondents, that is inconsistent with Moore's asserted rights under the state and federal constitutions to challenge a proposed method of punishment that he deems to violate the Eighth Amendment" and would subject his counsel to monetary penalties for purported violations of the agreement, "whose scope ultimately hinges on the statutory interpretation at the core of this litigation." App. at 045-46.

38.    Thus, when SCDC officials returned around 10:30 a.m. on November 20—the day his statutory right to select an execution method expired—to obtain Moore's selection, he and his counsel still had no information about how SCDC would carry out the execution. Accordingly, Moore refused to sign either Notice of Election form presented to him by SCDC officials and instead wrote the following: "I can not make a selection at this time to method because my attorney and I do not have information for the protocols. By not selecting does not mean I waive my right to select." True and accurate copies of these forms are attached to this complaint as Exhibit 14.

39.    Also that morning, at 11:53 a.m., the Supreme Court of South Carolina summarily denied all three of Moore's petitions without ordering briefing or reaching the merits of Moore's claims. App. at 047-48.

40.    At 4:54 p.m. on Friday, November 20, after Moore's petitions had been denied and after his time to select had expired, counsel for SCDC sent a letter to Moore's attorneys that included the following representations:

> SCDC's current lethal injection protocol is a three-drug protocol, which begins with an injection of Pentobarbital, followed at an appropriate time interval by Pavulon (Pancuronium Bromied), and then followed at an appropriate time interval by Potassium Chloride. . . . SCDC reserves the right to amend its lethal injection protocol, and if it is unable to secure sufficient quantities of each of the three drugs listed above, it is prepared to enact a one-drug protocol, which would consist of the use of Pentobarbital Sodium. . . . Please advise Mr. Moore of this information.

A true and accurate copy of this letter, the November 20 Letter, is attached to the complaint as Exhibit 14.

41.    As of the date of this filing, Moore's execution remains scheduled for December 4, 2020. His statutory right to election has expired and there is no stay in place. On information and belief, if Moore is unable to obtain a stay in federal court, SCDC will carry out his execution in violation of Moore's statutory and constitutional rights.

### South Carolina's Execution Protocols and History of Botched Executions

42.    In South Carolina, the first person to die in the "modern" era was J.C. Shaw, who was put to death in the electric chair on January 11, 1985.

43.    Electrocution remained South Carolina's only method of execution for almost a decade after the new death penalty law was approved in 1977.

44.    On June 8, 1995, South Carolina became the twenty-fifth state to adopt lethal injection.

45.    The first person executed by lethal injection, using the "three-drug cocktail," was Sylvester Adams, an intellectually disabled Black man from York County who was put to death on August 18, 1996.

46.     Since then, all remaining death row inmates, with the exception of James Tucker and James Reed, both of whom chose the electric chair, have been executed by lethal injection.

47.     In South Carolina, as well as in numerous other states, the use of lethal injection has led to botched executions.

48.     For example, in South Carolina, in 1997, death-row inmate Michael Eugene Elkins suffered from medical conditions. His body had become swollen from liver and spleen problems, and it took nearly an hour to find a suitable vein for the insertion of the catheter. Executioners failed numerous times to find a suitable vein, and Elkins asked the executioners, "Should I lean my head down a little bit?" to assist them in their attempts and probing, before his executioner located a suitable vein in the back of his neck. The execution began at 12:01 a.m., and, almost an hour later, after a prolonged execution, Elkins was pronounced dead at 12:58 a.m.

49.     After Elkins' botched execution, South Carolina did not change the three-drug sequence that began with sodium thiopental until 2009, after executing twenty-eight others in a similar manner, despite the challenges Elkins' execution presented. In one of those cases, the execution of Ronnie Howard, the condemned man had a strong heartbeat more than fifteen minutes after the lethal injection began, a signal, according to medical professionals, that he experienced excruciating pain and that the drugs did not work as intended. South Carolina used a three-drug sequence beginning with pentobarbital only once, in May of 2011.

50.     Now, it is unclear what chemicals—if any—South Carolina has procured for executions. On information and belief, Defendants are attempting to secure lethal injection drugs from unknown sources, which may include other states, underregulated compounding pharmacies, or other illegal routes. *See* Downing Aff. ¶ 44.

51.     As a result of Defendants' ahistorical refusal to provide the protocols, attorneys who must inform the court and counsel their clients about possible Eighth Amendment violations have inadequate information regarding the type of chemicals or methods of electrocution that will be used to execute their clients. Without this information, Moore and his attorneys have no way to assess the risks that any given method poses.

**Defendants Continue to Deny Moore Access to**
**Essential Information About How They Plan to Execute Him**

52.     Defendants will not disclose the lethal injection or electrocution protocols they plan to use to carry out Moore's execution.

53.     Moore has attempted to obtain details of the applicable protocols through all available legal means.

54.     On September 1, 2020, undersigned counsel for Moore sent Defendant Stirling the Moore Letter.

55.     Among other information, the undersigned requested the following information from SCDC:

> SCDC's lethal injection directive or protocol (current and/or as proposed to be in place at the time of the upcoming executions) and related information;

> SCDC's electrocution directive or protocol (current and/or as proposed to be in place at the time of the upcoming executions) and related information;

> Information of the following as it relates to both lethal injection and electrocution execution protocols;

> Information as it relates to COVID-19 and executions by lethal injection or electrocution in the custody or control of SCDC.

56.     This information is pertinent to undersigned counsel's obligations under Section 24-3-530 of the South Carolina Code to provide Moore with adequate legal representation.

For example, without access to this information, undersigned counsel cannot effectively consult with medical experts and cannot counsel Moore as he prepares for his death.

57.     Four weeks after Moore's counsel sent the letter to Defendant Stirling and SCDC, on September 29, 2020, Salley W. Elliott, sent Moore's counsel the SCDC Letter denying Moore's request for information and asserting Moore was not entitled to it.

58.     The SCDC Letter further stated, "We do not agree that you are entitled to the information you have requested." (SCDC Letter at 1.)

59.     The SCDC Letter further provided, "The SCDC protocols to carry out an execution, whether by lethal injection or electrocution, have been developed and implemented over the years with the safety and security of all involved in mind." (SCDC Letter at 2.)

60.     At this time, if South Carolina were to carry out his execution via lethal injection, Moore would not be in possession of the following important information:

> The type of lethal injection drug(s) to be used;
>
> The supplier(s) and/or compounder(s) of the lethal injection drugs, and the date or dates on which the drugs were manufactured;
>
> Information about quality control measures used to ensure the purity and efficacy of the lethal injection drugs, including the results of any tests or analyses performed on the drugs;
>
> Information about storage and handling of the lethal injection drugs;
>
> The expiration dates of lethal injection drugs to be used in the executions, including the expiration dates of any stabilizing compounds and expiration dates of the active execution drug(s);
>
> The mechanism or formula to be used for determining dosages and rates of drug administration.

61.     At this time, if South Carolina were to carry out his execution via an electrocution directive or protocol, Moore would not be in possession of the following information:

Information about the current operability of the electric chair, including the dates and nature of any repairs, modifications, or upgrades to the chair since its last use;

Dates and nature of any examinations of inspections of the chair since its last use;

Information regarding the current intended to be administered, the voltage intended to be administered, and how such voltage will be administered and for what length(s) of time to Mr. Moore;

Information regarding any testing or proposed testing of the electric chair since its last use.

### Lack of Review of the Execution Protocols and Other Essential Information

62.    Accordingly, Moore is left to trust the word of the Defendants that they will either execute him pursuant to a protocol that SCDC represents it developed "over the years with the safety and security of all involved in mind," SCDC Letter at 2, or that it will amend (with no guarantee of notice) the method at any time, the details of which it will not provide to Moore ahead of his execution and without which Moore was unable to make an informed selection about the manner of his death. (November 20 Letter.) Both approaches are contrary to law.

63.    Due to SCDC's refusal to produce the lethal injection or electrocution protocols and other essential information about how it will execute Moore, Moore is unable to ascertain whether he may be compelled to undergo unconstitutional pain and torture upon his execution.

64.    If SCDC is not required to inform Moore about the means by which it will execute him, SCDC will be operating with a virtual blank slate in electing how to execute Moore. This is consistent with SCDC's assertion in the November 20 Letter that "SCDC reserves the right to amend its lethal injection protocol," without notice to Moore.

65.    Because Moore was unable to make a selection without the information he has requested from SCDC, SCDC will, on information and belief, deem him to have waived the right to choose, and he will be executed by SCDC's secretly-selected method of lethal injection.

66.    Moore has experienced extreme emotional distress due to the significant danger that he will experience pain and torture during his execution. Moore has also experienced extreme emotional distress due to the anxiety of not knowing how SCDC will kill him.

### Deficits in SCDC's Plan to Implement Lethal Injection Create an Unacceptable Risk that Moore's Death Will Cause Him Significant Pain and Suffering

67.    On information and belief, SCDC is presently not in possession of the lethal injection drugs pentobarbital, pancuronium bromide, or potassium chloride.

68.    On information and belief, there are no lawful or legitimate channels by which SCDC could presently obtain manufactured formulas of these three drugs. Downing Aff. ¶ 23.

69.    On information and belief, no licensed pharmacist may lawfully produce and provide drugs to SCDC for use in executions. Downing Aff. ¶ 38.

70.    Accordingly, on information and belief, SCDC is not able to procure the commercially manufactured drugs listed in its execution protocol through lawful or legitimate channels, and it is also not able to procure compounded drugs for use in executions without violating the law or causing a pharmacy or pharmacist to violate the law. Downing Aff. ¶¶ 2

71.    On information and belief, "[i]mproperly procured medicines from unauthorized sellers are at risk of adulteration or chemical change" as a result of, for example, improper handling or storage. Downing Aff. ¶ 62 (quotation marks omitted). Such drugs are more likely to be of dangerous quality and degraded potency and therefore more likely to produce botched executions.

72.    On information and belief, execution by lethal injection requires inserting hypodermic needles into the prisoner and establishing a line to a vein in order to quickly dispense the execution drugs.

73.    On information and belief, in order to ensure a sufficiently fast and painless execution, the lines must be established into a vein.

74.    On information and belief, due to the stress of the execution on the prisoner, establishing an insertion point into a vein is a non-trivial task.

75.    On information and belief, inexperienced and unqualified execution teams without sufficient training may make multiple attempts in order to establish an intravenous line. The repeated attempts cause unnecessary pain to the prisoner and will desecrate the body prior to execution.

76.    On information and belief, inexperienced and unqualified execution teams without sufficient training may mistakenly begin the execution without establishing a line through a vein, causing significantly delaying the time for the drugs to take effect and causing the prisoner extreme pain and suffering.

77.    On information and belief, even if an IV is properly placed, the rate at which the drug enters the bloodstream (i.e., how fast the executioner pushes down on the plunger) affects prisoner's experience.

78.    On information and belief, SCDC employees tasked with administering execution drugs are not trained. *See Baxley v. Ozmint*, No. 3:07-cv-04067-CMC, Amended Complaint, ECF No. 6 at ¶ 25 (Dec. 21, 2007). On at least one occasion, the employees administering the drugs developed their plan on how they would inject the drugs on the day of the execution as they were picking up the drugs. *Baxley*, No. 3:07-cv-04067-CMC, Bracy Dep., ECF No. 47-4 at 60-62, 69, 74-75 & ECF No. 47-5 at 107:13-22 (June 8, 2009). On another occasion, while the execution was taking place, drugs began to leak on the floor. *Baxley,* No. 3:07-cv-04067-CMC, Baxley Dep., ECF No. 47-8 at 153. The executioners hoped it would not be a problem and prepared to administer more drugs. *Id.* (describing Colie Rushton "act[ing] like it was all a game and laughing and joking and that kind of thing" while lethal injection "drugs along with [the condemned man's] blood and

everything went on the floor" and the condemned man "flat-line[ed] without us going to the second set of drugs"). These guess-and-check procedures increase the likelihood of a condemned person suffering a painful and torturous death.

79.     On information and belief, SCDC may force its employees to take part in Moore's execution, complicating the situation further by introducing the uncertainty of a disgruntled or emotionally unwell executioner. *E.g. Baxley*, No. 3:07-cv-04067-CMC, Amended Complaint, ECF No. 6 at ¶¶ 8-9, 15, 25 (Dec. 21, 2007).

## CLAIMS FOR RELIEF

### COUNT I

**(Deprivation of Procedural Due Process Under the Fourteenth Amendment to the United States Constitution for Moore's Cognizable Liberty Interest in Not Suffering a Needlessly Torturous Death)**

80.     Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

81.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides: "Nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. Art. XIV.

82.     Citizens are entitled to due process protections if the interest they assert falls within the implicit meaning of liberty or if it flows from an expectation created by state law or policies, *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

83.     This Claim for Relief is grounded in Plaintiff's cognizable liberty interest in his right not to be subjected to a needlessly torturous death.

84.     It is axiomatic that the right to life is the most fundamental of all rights. *See Louisiana ex rel Francis v. Resweber*, 329 U.S. 459, 467 (1947) (Frankfurter, J., concurring) ("The

safeguards of 'due process of law' and 'the equal protection of the laws' summarize the meaning of the struggle for freedom of English-speaking peoples. They run back to Magna Carta but contemplate no less advances in the conceptions of justice and freedom by a progressive society.").

85.    When the government seeks to deprive a citizen of this most fundamental right, the process to which the condemned person is entitled is correspondingly robust, to guarantee the constitutional promise of "fundamental fairness." *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 24-25 (1981) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 896 (1961)).

86.    Even when a citizen has been sentenced to die, the government is not entitled to execute that person in a manner that poses "a substantial risk of serious harm" or an "objectively intolerable risk of harm." *Farmer v. Brennan*, 511 U.S. 825, 842, 846, n.9 (1994).

87.    Procedural due process requires courts considering the adequacy of a state procedure to balance three factors: (1) the weight of the individual interest at stake; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and, (3) the government's interest in maintaining the existing procedures. *Mathews v. Eldridge*, 424 U.S. 319, 323, 335 (1976).

88.    Moore's right to not suffer a torturous death is weighty because it is among the most foundational rights protected in the federal constitution. *See Francis*, 329 U.S. at 463 (plurality opinion) ("The traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence.").

89.    The risk that Moore will be executed by torturous means if he is not able to review the information he has requested is great. Downing Aff. ¶ 45.

90.    The additional process Mr. Moore has requested—access to more detailed information about how he will be executed—would impose at most a *de minimus* burden on Defendants. At a minimum, Defendants have no interest in not providing Moore, his counsel, experts retained by his counsel, and other consulting attorneys with the protocols, which has been their practice in every single execution carried out in South Carolina since the 1970s.

## COUNT II

**(Deprivation of Procedural Due Process Under the Fourteenth Amendment to the United States Constitution for Moore's State-Created Expectation that He Will Be Able to Meaningfully Exercise His Right to Select Between Lethal Injection and Electrocution)**

91.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

92.    Citizens are entitled to due process protections if the interest they assert falls within the implicit meaning of liberty or if it flows from an expectation created by state law or policies, *Wilkinson*, 545 U.S. at 221.

93.    This Claim for Relief is grounded in Plaintiff's state-created interest, flowing from an expectation created by state law and policy, in making an informed selection between the two modes of execution South Carolina law authorizes.

94.    A state triggers procedural due process protections when the state, through law or through "the existence of rules and understandings, promulgated and fostered by state officials," creates a legitimate claim of entitlement. *See Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972). A state may therefore create a protected liberty interest by, for example, promulgating agency rules or enacting state statutes that give citizens of that state a legitimate expectation that they will receive the benefit of those rules or statutes. *E.g.*, *Vitek v. Jones*, 445 U.S. 480, 489-90 (1980) (a statute that provided prisoners could be transferred to mental institutions only if they were

determined to suffer from mental diseases or defects created a protectible liberty interest); *Greenholtz v. Inmates, Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979) (protected liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (a statute that granted good time credit to prisoners for time served absent serious misconduct created a protectable liberty interest); *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (same, for probation revocation); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (same, for parole revocation).

95.    Moore has a protected liberty interest in making an informed decision about how he will be executed, pursuant to state law and consistent with SCDC's historical practice of disclosing at least the execution protocols if requested by the condemned inmate's attorneys.

96.    On information and belief, well ahead of each of the twenty-two executions that South Carolina carried out between 1999 and 2009, SCDC provided copies of the protocols that were in effect to the condemned men's attorneys.

97.    Moore's interest is, for the reasons described above, weighty, and the risk that he will be deprived of the opportunity to make an informed selection if SCDC does not provide him with the materials he has requested is a certainty.

98.    The additional process Mr. Moore has requested—access to information about how he will be executed—would impose at most a *de minimus* burden on Defendants. At a minimum, Defendants have no interest in not providing Moore, his counsel, experts retained by his counsel, and other consulting attorneys with the protocols, which has been their practice, where requested, in any execution carried out in South Carolina since the 1970s.

## COUNT III

**(Lack of Notice Guaranteed by the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and Article I, Section 3 of the South Carolina Constitution)**

99.     Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

100.     One of the most foundational elements of due process is the right to "notice and an opportunity to be heard." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). Enjoyment of the right to be heard first requires notice of the potential deprivation because notice is essential to a person's understanding of how she is being wronged and whether there is an opportunity to challenge it. *Vitek*, 445 U.S. at 496.

101.     By withholding the information Moore seeks, and denying Moore an opportunity to make an informed decision about how he will die, SCDC has failed to give Moore adequate notice of the method of his execution.

## COUNT IV

### (Violation of the Prohibitions on Cruel and Unusual Punishment Under the Eighth and Fourteenth Amendments to the United States Constitution)

102.     Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

103.     The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

104.     In a case challenging a method of execution, the inmate must show (1) that the challenged method poses a sure or very likely risk of serious illness and needless suffering and (2) that there exists an alternative method of execution that is feasible and readily implemented and that will significantly reduce the risk of serious pain. *Baze v. Rees*, 553 U.S. 35, 50, 52 (2008).

105.     By withholding the information Moore has requested, Defendants are precluding Moore from filing a complaint that includes this required information. Their interference with

Moore's efforts to assert his constitutionally protected right not to die by torturous means is itself a violation of the Eighth Amendment because it exposes him to an "objectively intolerable risk of serious harm." *Id.* at 50. This risk is heightened in this case because South Carolina has not executed anyone, by any method, in almost a decade. Moreover, on information and belief, South Carolina has never executed anybody using a single-drug protocol (one of SCDC's recent proposals), and SCDC has indicated that it does not presently have the drugs to carry out an execution, meaning a December 4 execution would require hasty acquisition of execution drugs through non-lawful or illegitimate channels. *See* Downing Aff. ¶¶ 23, 38, 44-60.

106.     Executing Moore pursuant to a lethal injection protocol without established safeguards would violate his rights under the Eighth and Fourteenth Amendments to be free from Cruel and Unusual Punishment.

107.     The Defendants are deliberately indifferent to Moore's rights in violation of the Eighth and Fourteenth Amendments.

108.     South Carolina permits electrocution as an elective alternative to lethal injection. On information and belief, South Carolina has used the same electric chair since 1912.

109.     Since 1977, there have been several botched executions by electric chair, including:

    a.    In the 1997 execution of Pedro Medina in Florida. During the execution, Mr. Medina's head burst into flames. A Florida court subsequently found that this occurred as a result of human error.

    b.    In the 1991 execution of Derick Lynn Peterson in Virginia, a doctor found Mr. Peterson still alive after the first two applications of electricity. In total, it took three applications over a period of 7.5 minutes for the execution.

c.    In the 1990 execution of Wilbert Lee Evans in Virginia, the first application of electricity increased Mr. Evans' blood pressure causing his nose to bleed profusely. The blood drenching his shirt caused a sizzling sound as it dripped. Mr. Evans continued to moan until a second burst of electricity was applied.

110.    On information and belief, South Carolina has executed at least one person by electrocution in a manner that caused needless and excruciating pain. *See Baxley,* No. 3:07-cv-04067-CMC, Baxley Dep., ECF No. 47-8 at 140-41 (describing the electrocution of James Tucker, after which "they took the hood off and the inmates face was black, had his mouth like that, and like I said, his eyes and everything was just like he was in just gruesome pain").

111.    The Supreme Courts of Georgia and Supreme Court of Nebraska have found the electric chair constitutes cruel and unusual punishment. *See State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008) (explaining that "electrocution has proven itself to be a dinosaur more befitting the laboratory of Baron Frankenstein than the death chamber of state prisons" and holding it violates the state constitutional prohibition on cruel and unusual punishments (cleaned up)); *Dawson v. State*, 554 S.E.2d 137 (Ga. 2001) (death by electrocution violates Georgia's constitutional prohibition on cruel and unusual punishment); *see also Bryan v. Moore*, 528 U.S. 1133 (2000) (after Florida switched lethal injection, dismissing as moot a previously granted petition for writ of certiorari raising the question whether Florida's use of the electric chair "unnecessarily exposes [condemned men] to physical suffering and degradation" and "wanton psychological and moral cruelty" violates the Eighth Amendment).

## COUNT V

### (Violation of Moore's Right to Counsel Under the Criminal
### Justice Act)

112.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

113.    The Criminal Justice Act (CJA) and CJA policies require that a district court appoint counsel for "any financially eligible person who," among other things, is seeking to set aside or vacate a death sentence in proceedings under 28 U.S.C. § 2254. *See* 18 U.S.C. § 3006A(a)(1).

114.    Moore's counsel in his federal habeas proceedings, Lindsey Vann and Hannah Freedman, were appointed pursuant to the CJA. *See Moore*, No. 4:14-4691-MGL, ECF No. 17 (Dec. 17, 2014); *see also* Text Order, *id.*, ECF No. 171 (June 23, 2020) (substituting counsel). Because Moore faces a sentence of death, he has a statutory and constitutional right to representation up until his death sentence is carried out. The assistance of counsel means the effective assistance of counsel. *McMann v, Richardson*, 397 U.S. 759, 771, n.14 (1970).

115.    By denying Moore and his counsel access to information that is necessary for Moore to make the election decision, SCDC has constructively denied Moore the right to the assistance of counsel.

## COUNT VI

### (Preliminary Injunction}

116.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

117.    Defendants' refusal to provide Moore the information he has requested threatens to permanently deprive him of his federal constitutional and statutory rights and his due process

rights in connection with his statutory election. Unless they are enjoined, Defendants will attempt to carry out Moore's execution on December 4 using a process that has never been disclosed to him or to any court and that risks needlessly subjecting him to extreme pain and suffering. Moore will file a motion and a memorandum of law requesting a preliminary injunction.

## COUNT VII

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201}

118.    Plaintiff incorporates by reference each and every statement and allegation set forth throughout this complaint as if fully set forth herein.

119.     Defendants' refusal to provide Moore the information he has requested, about how SCDC will carry out his December 4 execution, violates Moore's rights guaranteed by the federal constitution.

## PRAYER FOR RELIEF

WHEREFORE, Richard Bernard Moore requests that this Court:

1.  Grant a preliminary injunction prohibiting the Defendants from carrying out, or attempting to carry out, Moore's execution without providing him the information he has requested with sufficient notice of at least one month ahead of his scheduled execution date.

2.  Grant declaratory relief, as requested in this Complaint.

3.  Grant further relief as the Court deems just and proper.

Respectfully submitted,

s/J. Christopher Mills

J. CHRISTOPHER MILLS
Fed. ID # 4802
J. CHRISTOPHER MILLS, LLC
2118 Lincoln Street
Columbia, SC 29202

EMILY PAAVOLA
Fed. ID # 11488
900 Elmwood Ave., Suite 200
Columbia, SC 29201

LINDSEY S. VANN
FED. ID # 11872
HANNAH FREEDMAN
FED. ID # 13140
JUSTICE 360
900 Elmwood Ave, Suite 200
Columbia, SC 29201